# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
### WESTERN DIVISION

| | | |
|---|---|---|
| **GENESIS FINANCIAL SOLUTIONS, INC.,** | ) | |
| | ) | |
| **Plaintiff/Counter-Defendant,** | ) | |
| | ) | |
| **v.** | ) | **No. 09-cv-02104-STA-cgc** |
| | ) | |
| **NATIONAL CAPITAL MANAGEMENT, LLC.,** | ) | |
| | ) | |
| | ) | |
| **Defendant/Counter-Plaintiff.** | ) | |

_____

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
_____

Before the Court is Defendant National Capital Management, LLC's Motion for Summary Judgment (D.E. # 81), filed on January 13, 2011. Plaintiff Genesis Financial Solutions, Inc. filed a Response in Opposition on February 14, 2011. (D.E. # 85.) Defendant filed a Reply brief on February 21, 2011. (D.E. # 91.) Plaintiff, after receiving leave of the Court, filed a Sur-Reply on March 1, 2011. (D.E. # 94.) For the reasons set forth below, the Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**.

## BACKGROUND

On February 20, 2009, Genesis Financial Solutions, Inc. ("Plaintiff") filed a Complaint alleging five counts: breach of contract and anticipatory breach of contract, declaratory judgment, indemnification or attorney's fees, breach of the implied covenant of good faith and fair dealing, and fraudulent misrepresentation. (D.E. # 1.) On April 29, 2009, National Capital Management, LLC ("Defendant") filed an Amended Answer, accompanied by counterclaims.

(D.E. # 9.) These counterclaims include breach of contract and the rightful termination of performance, indemnification or attorney's fees, breach of the implied covenant of good faith and fair dealing, declaratory judgment, and violation of the Tennessee Consumer Protection Act. Defendant has moved for summary judgment on all of Plaintiff's claims and Defendant's claim against Plaintiff for breach of Section 9 of the Current Agreement. (Def.'s Mot. for Summ. J., D.E. # 81, at 4.) The following facts are undisputed for purposes of this Motion unless otherwise noted.

Plaintiff is a Delaware corporation with its principal place of business in Beaverton, Oregon. (Def.'s Statement of Facts ¶ 1.) Defendant is a limited liability company licensed to do and doing business in Tennessee. (*Id.* ¶ 2.) Defendant's principal place of business is in Memphis, Tennessee. (*Id.*)

The parties entered into two agreements relevant to this case. The first agreement, entered into on July 31, 2008 ("Predecessor Agreement"), was a "Forward Flow Bankruptcy Account Purchase Agreement," in which Defendant agreed to periodically purchase bankruptcy accounts from Plaintiff. (Compl. ¶ 10; Answer ¶ 10.) The second agreement, entered into on October 8, 2008, was also entitled "Forward Flow Bankruptcy Account Purchase Agreement" (the "Current Agreement"), and the Current Agreement wholly superseded the Predecessor Agreement. (Def.'s Statement of Facts ¶ 3.) The Current Agreement provided that Plaintiff was to sell unpaid accounts, including consumer credit card accounts, to Defendant. (*Id.* ¶ 4.) The only difference between the Predecessor Agreement and the Current Agreement was the removal of eleven words from Sections 5.6 and 9.2. (*Id.* ¶ 20-21.) Pursuant to the amended Section 5.6

of the Current Agreement, Plaintiff expressly represented to Defendant that each of the accounts

sold would be, as of the Closing Date:

> a *legal, valid and binding obligation* of the related Debtor, except as enforcement may be limited by bankruptcy, insolvency, reorganization or by general equity principles (regardless of whether such enforcement is considered in a proceeding in equity or at law).

(*Id.* ¶ 5 (emphasis added).) Section 5.6 is Plaintiff's Representation and Warranty that each

Account is a "legal, valid, and binding obligation" as of the closing date of each sale of

individual groups of accounts. (*Id.*)

On October 21, 2008 (the "Closing Date"), Defendant purchased the first group of

accounts delivered by Plaintiff for a purchase price of $224,490. (*Id.* ¶ 6.) Section 9 of the

Current Agreement provides that Defendant may, at its election, re-assign any accounts to

Plaintiff which do not meet the conditions set forth in Sections 9.1 through 9.8 of the Current

Agreement. (*Id.* ¶ 7.) If Defendant validly elects to reassign the accounts, the language of

Section 9 obligates Plaintiff to accept reassignment. (*Id.*) Section 9.2 specifically notes:

> As of the Closing Date, . . . the Account represents a *legal, valid and binding* obligation of the related Debtor, except as enforcement may be limited by bankruptcy, insolvency, reorganization or by general equity principles (regardless of whether such enforcement is considered in a proceeding in equity or at law).

(*Id.* (emphasis added).) Section 9.2 provides that Seller has marketable title to each Account,

which is possible only if the Account is a legal, valid, and binding obligation as of the Closing

Date. Moreover, Section 3.2 of the Current Agreement requires Defendant to exercise its right to

re-assign on or before the Claim Verification Date, which is thirty (30) days after the Closing

Date. (*Id.*) Further, Section 9 provides that if Defendant has paid for the re-assigned accounts,

Plaintiff is required to refund to the Defendant the purchase price paid for such re-assigned

accounts.  (*Id.* ¶ 8.)  The Predecessor Agreement and the Current Agreement were virtually

identical, except for the stricken eleven words below, which were removed from Section 5.6 and

9.2 by mutual agreement of the parties and are not reflected in the Current Agreement.

> Each account represents a legal, valid and binding obligation of the related Debtor,
> except as enforcement may be limited by bankruptcy, insolvency, reorganization or
> ~~other similar laws affecting the enforcement of creditors' rights generally and~~ by
> general equity principles (regardless of whether such enforcement is considered in
> a proceeding in equity or at law).

(Def.'s Statement of Facts ¶ 20.)

Defendant states that on November 17, 2008, it notified Plaintiff by e-mail that the

accounts purchased on the Closing Date were time-barred under the applicable statute of

limitations.  (Def.'s Statement of Facts ¶ 9.)  As such, Defendant noted that these accounts did

not comply with the representations and conditions contained in Sections 5.6 and 9.2 and that

they would be re-assigned pursuant to Section 9 of the Current Agreement.  (*Id.*)  Plaintiff

disputes these statements to the extent they imply that *all* of the accounts purchased on the

Closing Date consisted of accounts that were time-barred.  (Pl.'s Resp. to Def.'s Statement of

Facts ¶ 9.)  Defendant does go on to note that of the 1,276 accounts purchased on the Closing

Date, 960 accounts—approximately 75%—were beyond the applicable statute of limitations

with regard to the underlying debt (such accounts referred to herein as the "Time-Barred

Accounts").  (Def.'s Statement of Facts ¶ 10.)

On November 20, 2008, Defendant followed up this notification with a letter specifically

identifying the Time-Barred Accounts, along with ninety-one additional accounts that did not

satisfy the conditions contained in the Current Agreement.  (*Id.* ¶ 11.)  Defendant demanded that

Plaintiff re-purchase the re-assigned accounts pursuant to Section 9 and refund the purchase

price of $203,280.59.  (*Id.*)  Defendant states that the ninety-one accounts re-assigned in addition

to the Time-Barred Accounts were re-assigned for one or more of the following non-conforming

conditions under the Current Agreement:  the bankruptcy case had been dismissed, a claim

objection had been filed, the account was in a Chapter 7 bankruptcy case, or no bankruptcy case

was found.  (*Id.* ¶ 12.)

Plaintiff has admitted that the limitations period on the Time-Barred Accounts had run

prior to the Closing Date but has refused to re-purchase the 960 Time-Barred Accounts.  (*Id.* ¶

13.)  Plaintiff has also refused to re-purchase the other ninety-one non-conforming accounts.

(*Id.*)

In November 2008, Plaintiff submitted to Defendant a second group of accounts for

purchase under the Current Agreement.  (*Id.* ¶ 14.)  Approximately 70% of these accounts were

also beyond the applicable statue of limitations with regard to the underlying debts.  (*Id.*)  On

November 17, 2008, Defendant notified Plaintiff that it would not purchase the time-barred and

other non-conforming accounts in the second group of accounts submitted by Plaintiff because

they did not comply with the representations and conditions contained in the Current Agreement,

in particular the representations and conditions contained in Sections 5.6 and 9.2.  (*Id.* ¶ 15.)

Defendant informed Plaintiff that it would continue to purchase accounts which satisfied the

conditions and representations under the Current Agreement.  (*Id.*)

All of the bankruptcy cases relating to the Time-Barred Accounts were still pending as of

the Closing Date.  (*Id.* ¶ 16.)  These cases were pending in approximately 140 different

bankruptcy courts.  (*Id.*)  Most—if not all—of these Time-Barred Accounts pertain to

bankruptcies filed under Chapter 13, and Defendant states that proceedings under this Chapter may last for five years or more. (*Id.*)

Defendant then highlights the fact that prior to entering into the Current Agreement, Plaintiff and Defendant were parties to the Predecessor Agreement. (Def.'s Statement of Facts ¶ 18.) Defendant states that pursuant to the Predecessor Agreement, on July 31, 2008, Plaintiff delivered accounts to Defendant, and Defendant paid for such accounts. (*Id.*) Substantially all of these accounts were similarly time-barred. (*Id.*)

Plaintiff disputes these facts to the extent they imply that the Predecessor Agreement was simply "another contract" unrelated to the Current Agreement, and that Defendant paid in full under the Predecessor Agreement. (Pl.'s Resp. to Def.'s Statement of Facts ¶ 18.) Plaintiff states that, in fact, the Predecessor Agreement and the Current Agreement are inseparable and form a single transaction. (*Id.*) Moreover, Plaintiff notes that Defendant paid only the first of the six required monthly payments under the Predecessor Agreement before Defendant became unsatisfied with the economic performance of the Time-Barred Accounts and decided to require a renegotiation of the Predecessor Agreement in order to proceed. (*Id.*)

Plaintiff notes that Defendant never told Plaintiff the real reason for wanting to delete the eleven words. (Def.'s Statement of Facts ¶ 20.) In fact, Plaintiff states that although Defendant told Plaintiff that Defendant's deletion of the eleven words was needed to conform to the requirements of Defendant's lender and investment partners, discovery confirmed that there were no such requirements. (*Id.*) According to Plaintiff, discovery further disclosed that Defendant's true reason for deleting the eleven words from the Predecessor Agreement was an attempt to get out of the obligation to purchase time-barred accounts. (*Id.*) Moreover, Plaintiff states that the

purchase price for the Predecessor Agreement was not even changed for the Current Agreement, as lowering the cost for the accounts would have been notice to Plaintiff as to the real reason for the new contract. (*Id.*)

In contrast, Defendant simply states that it paid for the July 2008 accounts, but subsequently notified Plaintiff that it was not going forward with any further transactions and demanded a revision to the language of Sections 5.6 and 9.2, which Plaintiff agreed to make. (Def.'s Statement of Facts ¶ 19.) Plaintiff disputes this characterization to the extent it implies that the Predecessor Agreement was a separate transaction from the Current Agreement. (Pl.'s Resp. to Def.'s Statement of Facts ¶ 19.) Also, Plaintiff disputes the statements to the extent they imply that Defendant notified Plaintiff of its wish to relieve itself of its admitted obligation to complete five more monthly purchases of time-barred accounts under the Predecessor Agreement. Additionally, Plaintiff disputes these statements to the extent they imply that Defendant notified Plaintiff that the purpose of Defendant's proposed deletion of eleven words from the Predecessor Agreement was to relieve itself of its time-barred account purchase obligation. (*Id.*) Plaintiff states that Defendant acted in bad faith with its "botched attempt" to modify the Predecessor Agreement. (*Id.*)

Defendant states that Plaintiff was the original drafter of Sections 5.6 and 9.2 in the Predecessor Agreement. (Def.'s Statement of Facts ¶ 21.) The change to remove the language "other similar laws affecting the enforcement of creditors' rights generally" from Sections 5.6 and 9.2 was recommended by Defendant. (*Id.*) Plaintiff agreed to make the change. (*Id.*)

Plaintiff disputes this allegation to the extent it implies that Defendant's deletion of eleven words in the Current Agreement somehow extinguished Defendant's obligation to

purchase the Time-Barred Accounts.  (Pl.'s Resp. to Def.'s Statement of Facts ¶ 21.)  Plaintiff

states that the deletion of the eleven words did no such thing.  (*Id.*)

## STANDARD OF REVIEW

Summary judgment is proper where "there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."[1]  "[A] party seeking summary

judgment always bears the initial responsibility of informing the district court of the basis for its

motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any,' which it believes demonstrate the

absence of a genuine issue of material fact."[2]  When considering a motion for summary

judgment, "the court must view the evidence and draw all reasonable inferences in favor of the

non-moving party."[3]  At summary judgment, the primary "issue is 'whether the evidence

presents a sufficient disagreement to require submission to a jury or whether it is so one-sided

that one party must prevail as a matter of law.'"[4]  Thus, the Court will view all evidence and draw

all reasonable inferences in favor of Plaintiff, as Plaintiff is the non-moving party.

## CHOICE OF LAW

Before the Court can proceed to the issues presented by this case, it must decide which

state's law to apply: that of Oregon or Tennessee.  Under the *Erie* doctrine, in cases where a

---

[1]     *Pittman v. Cuyahoga Cnty. Dep't of Children and Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011) (citing Fed. R. Civ. P. 56(a)).

[2]     *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(a)).

[3]     *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003).

[4]     *Pittman*, 640 F.3d at 723 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).

federal court exercises diversity jurisdiction, the federal court is bound to apply the substantive law of the forum state as if the action had been brought in a state court of the jurisdiction where the federal court is located.[5]  Therefore, "a federal court must apply the choice of law rules of the state in which it sits, "[6] and the Court will apply Tennessee's choice of law rules.  In Tennessee, the "construction and validity of a contract are governed by the law of the place where the contract [wa]s made."[7]  This principle is known as *lex loci contractus*, meaning that "a contract is presumed to be governed by the law of the jurisdiction in which it was executed absent contrary intent."[8]  That contrary intent can be demonstrated by including a choice of law provision in the contract.[9]

In its Memorandum Addressing the Choice of Law Issues, Plaintiff acknowledges that the Current Agreement does not contain a "'general' choice of law provision."[10]  However, it argues that Section 9.7 of the Current Agreement contains a "'specific' choice of law provision that controls the legality of the sold OOS accounts."[11]  Defendant does not address this argument

---

[5]     *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938); *Corrigan v. U.S. Steel Corp.*, 478 F.3d 718, 723 (6th Cir. 2007).

[6]     *Mahne v. Ford Motor Co.*, 900 F.2d 83, 85 (6th Cir. 1990) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941)); *see generally Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938) (holding that federal courts with diversity jurisdiction must apply state substantive law and federal procedural law).

[7]     *Ohio Cas. Ins. Co. v. Travelers Indem. Co.*, 493 S.W.2d 465, 466 (Tenn. 1973).

[8]     *Vantage Tech., LLC v. Cross*, 17 S.W.3d 637, 650 (Tenn. Ct. App. 1999).  A contract is executed or made in the state in which it was signed.  *See In re Estate of Davis*, 184 S.W.3d 231, 233-35 (Tenn. Ct. App. 2004).

[9]     *See id.*

[10]     Pl.'s Mem. Addressing the Choice of Law Issues, D.E. # 103, at 4 (April 4, 2011).

[11]     *Id.*

in its subsequent Memorandum.[12]  Section 9.7 provides that "[t]he law applicable to any Account is federal, state[,] or local law of the 50 states or its territories."  According to Plaintiff, Section 9.7 represents the "parties' sophisticated recognition that each account will be governed by the law of the state in which the indebtedness accrued."[13]  The Court agrees with this interpretation. But as Plaintiff states, this provision is not a general choice of law provision governing the law to be applied when interpreting the contract; rather, it is a provision addressing the law applicable to the accounts bought and sold under the Current Agreement.  Thus, the Court finds that Section 9.7 is not a choice of law provision governing the law to be applied to the Current Agreement and that the Current Agreement does not contain a choice of law provision.

Because there is no choice of law provision in the Current Agreement, the Court next turns to whether the parties allege a conflict between Tennessee law and Oregon law as applied to this case.  The U.S. Supreme Court has said that "there can be no injury in applying [the forum state's] law if it is not in conflict with that of any other jurisdiction connected to this suit."[14]  Additionally, "when neither party argues that the forum state's choice of law rules require" the application of another state's substantive law, "the court should apply the forum state's substantive law."[15]  Here, neither party contends that Oregon law differs from Tennessee law in any material respect; in fact, they contend that the application of either state's law would

---

[12]     Def's Mem. on Choice of Law Question and in Resp. to Pl.'s Mem. Addressing the Choice of Law Issues, D.E. # 104 (April 21, 2011).

[13]     Pl.'s Mem. Addressing the Choice of Law Issues, D.E. # 103, at 4 (April 4, 2011).

[14]     *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 816 (1985).

[15]     *Wilkes Assocs. v. Hollander Indus. Corp.*, 144 F. Supp. 2d 944, 949 n.4 (S.D. Ohio 2001) (quoting *ECHO Inc. v. Whitson Co., Inc.*, 52 F.3d 702, 707 (7th Cir. 1995)).

produce the same result.[16]  Moreover, Defendant argues that Tennessee law applies,[17] and

Plaintiff's Choice of Law Memorandum fails to cite legal authority determining which state's

law to apply.[18]  Accordingly, the Court follows these principles and chooses to apply Tennessee

law.

## BREACH OF CONTRACT AND ANTICIPATORY BREACH OF CONTRACT

In its Motion for Summary Judgment, Defendant moved for summary judgment on

Plaintiff's breach of contract and anticipatory breach of contract claim and its own counterclaim

for breach of contract.[19]  Plaintiff asserts that Defendant breached the Current Agreement "by

failing [to] pay for the November Purchase, the January Purchase, and the February Purchase."[20]

Plaintiff also submits that Defendant committed an anticipatory breach of the Current Agreement

when it notified Plaintiff that it would not purchase and pay for time-barred accounts after

Defendant had requested reassignment of the Time-Barred Accounts at issue.[21]  In its

Counterclaim, Defendant asserts that Plaintiff "breached the terms of [the Current Agreement]

---

[16]     Pl.'s Mem. Addressing the Choice of Law Issues, D.E. # 103, at 2 (April 4, 2011); Def's Mem. on Choice of Law Question and in Resp. to Pl.'s Mem. Addressing the Choice of Law Issues, D.E. # 104, at 4 (April 21, 2011).

[17]     Def's Mem. on Choice of Law Question and in Resp. to Pl.'s Mem. Addressing the Choice of Law Issues, D.E. # 104, at 3 (April 21, 2011).

[18]     Pl.'s Mem. Addressing the Choice of Law Issues, D.E. # 103, at 2 (April 4, 2011) ("From a legal standpoint, it is unclear to [Plaintiff] whether the Current Agreement was 'executed' in Tennessee or Oregon, or both states—but it does not matter.  The resolution of whether OOS accounts were included or excluded from the . . . Current Agreement is the same under Tennessee or Oregon law.").

[19]     (Def.'s Mot. for Summ. J., D.E. # 81, at 4.)

[20]     (Compl. ¶ 51.)

[21]     (Compl. ¶ 52.)

by submitting accounts that did not conform to the terms of [the Current Agreement and] by [Plaintiff's] refusal to provide credit or reimbursement of the purchase price of said non-conforming accounts."[22]  Moreover, Defendant asserts that these breaches were "material to the [Current Agreement]."[23]

In Tennessee, a breach of contract claim contains three basic elements: "(1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of contract."[24]  Here, neither party has claimed that the Current Agreement is unenforceable.  The main issue here is which party's nonperformance or performance not in compliance with the Current Agreement's terms amounted to a breach of contract.  An anticipatory breach of contract occurs when a party repudiates the contract before the time of performance under the contract.[25]  For a party to commit an anticipatory breach, "'the words and conduct of the contracting party must amount to a total and unqualified refusal to perform the contract.'"[26]

The material facts regarding the parties' alleged breaches of contract are not in dispute. Defendant purchased the first group of accounts from Plaintiff on October 21, 2008.  Those accounts included 960 Time-Barred Accounts.  That same month, Plaintiff submitted the second group of Accounts for purchase under the Current Agreement.  On November 17, 2008,

---

[22]     (Countercl. ¶ 11.)

[23]     (*Id.*)

[24]     *ARC Lifemed, Inc. v. AMC-Tennessee, Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005).

[25]     *UT Med. Grp., Inc. v. Vogt*, 235 S.W.3d 110, 120 (Tenn. 2007).

[26]     *Wright v. Wright*, 832 S.W.2d 542, 545 (Tenn. Ct. App. 1991) (quotation omitted).

Defendant requested reassignment of the Time-Barred Accounts and ninety-one additional non-conforming accounts to Plaintiff and notified Plaintiff that it would not purchase time-barred and other non-conforming accounts in the second group of Accounts. Defendant stated that it would continue to purchase Accounts satisfying the conditions and representations under the Current Agreement. Plaintiff refused to repurchase or accept reassignment of the 960 Time-Barred Accounts and the ninety-one other non-conforming accounts.

Because the interpretation of Sections 5.6 and 9.2 is central to the parties' claims in this case, the Court will first interpret the Current Agreement before evaluating which party breached the Current Agreement.

## Interpreting the Current Agreement

Plaintiff and Defendant have contrasting views on the proper interpretation of Sections 5.6 and 9.2. Plaintiff argued that

> the mere fact than an Account is Out of Statute does not constitute a breach of the representation and warranty contained in Section 5.6 of the [Current Agreement] so as to constitute a breach of a material representation pursuant to Section 4.3(B) of the [Current Agreement] allowing [Defendant] to terminate its obligation to purchase accounts.[27]

As to Section 9.2, Plaintiff argued that "the mere fact that an Account is Out of Statute does not constitute failure to meet the condition of Section 9.2 of the [Current Agreement] so as to require

---

[27] (Compl. ¶ 58.) Section 4.3(B) of the Current Agreement provides that

> [Plaintiff] or [Defendant] may terminate its obligation to sell or purchase Accounts on a prospective Closing Date if any of the following occurs: [Defendant] or [Plaintiff], respectively, has breached a material representation or agreement contained in [the Current Agreement] or in any document delivered in connection herewith and has not cured such breach within [thirty] business days after notice from the other party.

Genesis to accept a reassignment of the Account pursuant to Section 9 of the [Current Agreement]."[28]  In its Counterclaim, Defendant averred that

> the accounts selected by [Plaintiff] to be purchased by [Defendant] that were legally barred from enforcement as a result of being outside of the applicable statute of limitation[s] did not conform to the [Current Agreement] and [are] a breach of that part of the [Current Agreement] that required [Plaintiff] to select legal, valid, and binding obligations and that such breach requires [Plaintiff] to accept the reassignment of said accounts and allows [Defendant] to terminate the agreement.[29]

Accordingly, the parties have requested the Court to determine the effect and meaning of the two sections of the Current Agreement at issue in this case: Sections 5.6 and 9.2.

In Tennessee, "it is well settled that the language used in a contract must be taken and understood in its plain, ordinary, and popular sense."[30]  In construing contracts, the words expressing the parties' intentions should be given their usual, natural, and ordinary meaning.[31] When determining whether a contract's language is ambiguous, Tennessee courts examine the allegedly ambiguous language in the context of the entire instrument as a whole to determine whether the ambiguous language calls for interpretation.[32]  According to the Tennessee Court of Appeals,

> [c]ontractual language is ambiguous when it is susceptible to more than one interpretation and reasonably intelligent persons could come to different conclusions as to the meaning of the contract. However, an ambiguity arises in a

---

[28]    (*Id.* ¶ 57.)

[29]    (Def.'s Countercl. ¶ 23.)

[30]    *Fisher v. Revell*, 343 S.W.3d 776, 779 (Tenn. Ct. App. 2009) (citation omitted).

[31]    *Id.* (citing *Ballard v. North Am. Life & Cas. Co.*, 667 S.W.2d 79 (Tenn. Ct. App. 1983)).

[32]    *Id.* at 780

contract only when contractual terms are susceptible to fair and honest differences, and when both of the interpretations advanced are reasonable.[33]

The portions of the Current Agreement at issue are Sections 5.6 and 9.2, which provide that as of the Closing Date,

> [each] Account represents a legal, valid and binding obligation of the related Debtor, except as enforcement may be limited by bankruptcy, insolvency, reorganization or by general equity principles (regardless of whether such enforcement is considered in a proceeding in equity or at law).

Black's Law Dictionary cross references "legal obligation"[34] with "obligation," which is "a legal or moral duty to do or not do something" or "a formal, binding agreement or acknowledgment of a liability to pay a certain amount or to or do a certain thing for a particular person or set of persons."[35] "Legal" has multiple definitions as well: "of or relating to law; falling within the province of law," "established, required, or permitted by law; lawful," and "of or relating to law as opposed to equity."[36] "Binding" is the adjective form of the verb "to bind," meaning "to impose one or more legal duties on a person or institution."[37] "Valid" is an adjective meaning "legally sufficient; binding" or "meritorious."[38]

The Court interprets the Current Agreement to apply "legal," "valid," and "binding" as adjectives modifying "obligation." Thus, a "legal obligation" could refer to an obligation at law

---

[33]     *Id.* (quotation omitted).

[34]     Black's Law Dictionary 906 (7th ed. 1999).

[35]     *Id.* at 1102.

[36]     *Id.* at 902.

[37]     *Id.* at 161.

[38]     *Id.* at 1548.

as opposed to an obligation at equity or an obligation that is lawful as opposed to unlawful. Using the ordinary meanings of these words, the Court finds the language of Sections 5.6 and 9.2 to be ambiguous because they are susceptible to more than one reasonable interpretation. The Court has already found as a matter of law that Section 5.6 of the Current Agreement is "ambiguous on its face" when confined to the Current Agreement's language alone.[39]  Because Section 9.2 contains the same language, it is ambiguous on its face as well.  After examining the plain and ordinary meanings of the words in Sections 5.6 and 9.2, the Court finds the Sections to be ambiguous as a matter of law.

The Court declines to reconsider its earlier ruling on the ambiguity of Sections 5.6 and 9.2 as requested by Defendants.  In its Order denying Plaintiff's Motion to Dismiss, the Court limited its review to the pleadings presented by the parties as required by Federal Rule of Civil Procedure 12.[40]  The Court "lack[ed] sufficient information to determine if out of statute accounts [we]re included in Section 5.6 solely from the language of the agreement," which is why the Court held that Section 5.6 was ambiguous as a matter of law.[41]  Because the case has progressed to summary judgment, the Court may now examine information in addition to the facial language of the pleadings themselves.

Because the Court has determined that Sections 5.6 and 9.2 are ambiguous, the Court now turns to additional rules of contract construction.  When confronted with an ambiguous

---

[39]     Order Denying Pl.'s Mot. to Dismiss and Granting Pl.'s Mot. to Strike, D.E. # 26, at 7 (Mar. 19, 2010).

[40]     *Id.* at 3-5.

[41]     *Id.* at 7.

contract provision, Tennessee courts resort to the rules of construction,[42] and if ambiguity remains after application of the pertinent rules, the legal meaning of the contract becomes a question of fact.[43] Moreover, "when a contractual provision is ambiguous, a court is permitted to use parol evidence, including the contracting parties' conduct and statements regarding the disputed provision, to guide the court in construing and enforcing the contract."[44] Additional parol evidence "might include the negotiations leading up to the contract, the course of conduct the parties followed as they performed the contract, and any utterances of the parties that might shed light upon their intentions."[45] The "construction of a contract is particularly suited to disposition by summary judgment" because the interpretation of a written contract is a matter of law and not of fact.[46] Where "the interpretation of a written agreement involves legal issues, and when the facts are not in dispute, the issues can be resolved at summary judgment."[47] Only if ambiguity remains after a court applies the pertinent rules of construction does the legal meaning

---

[42]    *Cummings Inc. v. Dorgan*, 320 S.W.3d 315, 333 (Tenn. Ct. App. 2009).

[43]    *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 889-90 (Tenn. 2002).

[44]    *Allstate Ins. Co. v. Watson*, 194 S.W.3d 609, 612 (Tenn. 2006).

[45]    *Cummings Inc.*, 320 S.W.3d at 333.

[46]    *Fisher v. Revell*, 343 S.W.3d 776, 779 (Tenn. Ct. App. 2009).

[47]    *Tompkins v. Helton*, No. M2002-01244-COA-R3-CV, 2003 WL 21356420, at *3 (Tenn. Ct. App. June 12, 2003) (citing *Standard Fire Ins. Co. v. Chester O'Donley & Assocs.*, 972 S.W.2d 1, 5-6 (Tenn. Ct. App. 1998)).

of the contract become a question of fact.[48]  Additionally, courts interpret contracts as they are

written "rather than according to the unexpressed intention of one of the parties.[49]

Because Sections 5.6 and 9.2 are ambiguous, the Court turns to relevant case law and

parol evidence to help it determine the meaning of Sections 5.6 and 9.2.  Tennessee courts have

long held that "the obligation of a debt the remedy on which is barred by the statute of

limitations [cannot] be said to be subsisting and legal."[50]  Thus, after the statute of limitations

passes, the debt remains a moral obligation, but its enforcement at law is limited: the defense of

the statute of limitations need only be asserted to prohibit collection on the debt.[51]  However, if

the statute of limitations defense is not timely raised at the collection proceeding, and no other

defenses to collection exist, the debtor becomes bound to pay the debt once again, without need

for new consideration.[52]  The prior legal obligation is resurrected and becomes valid, binding,

and enforceable once more.[53]

---

[48]    *Planters Gin Co.*, 78 S.W.3d at 889-90.  Here, the Court will be the fact-finder at any
future trial because the Court struck Defendant's jury request in its March 19, 2010, order
denying Plaintiff's Motion to Dismiss and granting Defendant's Motion to Strike Plaintiff's Jury
Request.

[49]    *Tompkins*, 2003 WL 21356420, at *3

[50]    *Terrell v. Ingersoll*, 78 Tenn. 77, *4 (1882); *accord Cocke v. Hoffman*, 73 Tenn. 105, *2
(1880) (noting that when collection on a debt is barred by the statute of limitations, the debt is
not "subsisting and legal," as its payment is not compulsory on a party in whose favor the statute
of limitations ran).

[51]    *See Terrell*, 78 Tenn at *4; *Cocke*, 73 Tenn at *2.

[52]    *Taylor v. Nixon*, 36 Tenn (4 Sneed) 352, *2 (1857).

[53]    *Id.*

For purposes of the Current Agreement, the meaning of the ambiguous language in Sections 5.6 and 9.2 depends upon how the Court interprets the phrase "legal, valid, and binding obligation." Here, the parties focus much of their briefing on courts' characterization of whether a debt is a "legal obligation" after the running of the statute of limitations to collect on the debt. Defendant argues that once the statute of limitations run, the debt is no longer a "legal obligation" under the Current Agreement because it is no longer an obligation at law. Under Defendant's interpretation, it will be known for certain whether an Account is a "legal obligation" under the Current Agreement when the statute of limitations passes.

On the other hand, Plaintiff submits that a debt whose payment obligation has been barred by the statute of limitations remains a "legal obligation" under the Current Agreement because it is possible for debtors to fail to raise the statute of limitations as a defense at their bankruptcy proceedings, thus resurrecting the debt's legal and binding nature. Under Plaintiff's interpretation, it will be known for certain whether an Account is a "legal obligation" under the Current Agreement after each time-barred account goes through bankruptcy proceedings and the time for assertion of the statute of limitations defense passes.

The Court finds the practical application of these definitions of "legal obligation" to the Current Agreement's terms and the differences between the Predecessor Agreement and the Current Agreement to be instructive in its interpretation of the Current Agreement. First, both Section 5.6 and 9.2 contain a specific triggering time: they require Accounts to be legal, valid, and binding obligations "as of the Closing Date." The Current Agreement defines "the Closing Date" to be "the time of closing on the date set forth in each Term Agreement entered into between Seller and Buyer . . . [which] will be no later than five business days after the Sale

Notification Date."[54]  The Sale Notification Date is "on or before the tenth day of each calendar month during the Term of the [Current Agreement] that [Plaintiff] delivers a Sale Notification File to [Defendant]."[55]  Sale Notification Files were to contain "computer files identifying accurate and complete information in all material respects to each Account."[56]  Thus, each sale under the Current Agreement would have its own Closing Date, at which point each Account would be required to be a "legal, valid, and binding obligation."

The Tennessee case law discussed previously affects the Court's interpretation of the Current Agreement.  Because Sections 5.6 and 9.2 required each Account to be a "legal, valid, and binding obligation" at the specific date and time controlled by each Closing Date, each Account's status as a legal, valid, and binding obligation must be readily ascertainable by that specific date and time.  If the Court were to adopt Plaintiff's position, the status of the Accounts as legal obligations would not be able to be ascertained until after bankruptcy proceedings for each Account had commenced and the time for the debtor to assert his or her statute of limitations affirmative defense had passed.  Consequently, the status of each Account as a "legal obligation" would not be known at the time of the Closing Date.  Such an interpretation seems to the Court to be illogical and contrary to a practical application of the Current Agreement's language.

---

[54]      Def.'s Answer & Counterclaim, D.E. # 9-2, at 1 § 1.8.  A sample "Term Agreement" was attached as Exhibit A to both the Predecessor Agreement and the Current Agreement.  The Term Agreement appears to be a fill-in-the-blank form which would set out the terms for each sale of Accounts under the Predecessor and Current Agreements, including the Closing Date, Claim Verification Date, Cut-Off Date, Number of Accounts to be sold, the Cut-Off Date Claim Amount, and the Purchase Price Payment.

[55]      *Id.* at 2 § 1.22.

[56]      *Id.* at 2 § 1.23.

Therefore, the Court finds that the phrase "legal, valid, and binding obligation" does not include debts whose remedies are barred by the statute of limitations. Under Tennessee law, a time-barred debt ceases to be a legal obligation, instead surviving as a mere moral obligation, upon the running of the statute of limitations—unless and until the debtor fails to assert the statute of limitations affirmative defense or another applicable defense. Because it can be known with certainty "at the Closing Date" whether an Account is a legal obligation, the Court interprets the phrase "legal, valid, and binding obligation" to exclude those debts whose statutes of limitations have run. By interpreting the Current Agreement in this way, the Court does not alter the interpretation of Tennessee's law regarding the effect of a statute of limitations affirmative defense on the collection of debts. Rather, the Court takes Tennessee's case law and uses it to determine the meaning of the specific Current Agreement at issue here.

Second, the Court turns to the difference between the Predecessor Agreement and the Current Agreement to continue its analysis of the meaning of Sections 5.6 and 9.2. The Predecessor Agreement qualifies as parol evidence, as it is the parties' first agreement in their course of conduct relevant to this case. Sections 5.6 and 9.2 of the Predecessor Agreement contained an additional exception from the requirement that Accounts be "legal, valid, and binding obligations": it provided that each Account would be a legal, valid, and binding obligation "except as enforcement may be limited by . . . other similar laws affecting the enforcement of creditors' rights generally."[57] The Court interprets this phrase to mean that each

---

[57]     The Court also notes that Sections 5.6 and 9.2 contain an Account exception for enforcement limited by "general equity principles." However, a statute of limitations is not a general equity principle. The equitable counterpart to a statute of limitations is the defense of laches, and neither party has raised the issue of laches. Thus, the availability of a statute of limitations defense to the collection of a debt  is not a "general equity principle" exception to the

Account would be required to be a legal, valid, and binding obligation unless it satisfied one of the listed exceptions. The availability of a statute of limitations defense to a bankruptcy claim would certainly affect "the enforcement of creditors' rights generally." The creditor's ability to collect on the debt would be barred if the debtor asserted the statute of limitations defense. The specter of such an affirmative defense to payment would affect the enforcement of creditors' rights. Thus, under the Predecessor Agreement, time-barred accounts would have qualified under this exception and would thus have satisfied the requirements of Sections 5.6 and 9.2.

The Current Agreement eliminated those eleven words from Sections 5.6 and 9.2. Defendant paid Plaintiff for the only transaction of Accounts to take place under the Predecessor Agreement, and substantially all of those accounts were time-barred.[58] However, upon removal of the eleven words in the Current Agreement's version of Sections 5.6 and 9.2, Defendant refused to pay for the 960 Time-Barred Accounts submitted by Plaintiff, as well as other additional nonconforming Accounts. Thus, the Court finds the removal of the eleven words to be highly relevant to its interpretation of the Current Agreement and the parties' intent as to the meaning of the Current Agreement.

The Current Agreement does not contain the "creditors' rights" exception to the requirement that Accounts be legal, valid, and binding obligations. The removal of that specific eleven-word exception indicates that the parties intended to require Accounts to be legal, valid, and binding obligations without creating an exception for Accounts affected by "laws affecting the enforcement of creditors' rights generally." Thus, although the Predecessor Agreement's

_____

Current Agreement's requirement that Accounts be "legal, valid, and binding obligations."

[58]     (Def.'s Statement of Facts ¶ 18.)

terms permitted the Plaintiff to sell time-barred accounts to Defendant and remain in compliance with those terms, the Current Agreement's terms do not permit Plaintiff to sell time-barred accounts and comply with its terms. Moreover, the Current Agreement does not differ from the Predecessor Agreement except for this alteration. Consequently, the Court infers that the parties intended to continue dealing with each other as they did under the Predecessor Agreement—with the exception that, after adoption of the Current Agreement, time-barred debts would no longer be acceptable Accounts bought and sold under the Current Agreement. Therefore, Sections 5.6 and 9.2 are no longer ambiguous under the foregoing analysis. The Court finds that Sections 5.6 and 9.2 do not include time-barred accounts as "legal, valid, and binding obligations" under the Current Agreement.

Based on the Court's interpretation of the Current Agreement as discussed above, the Court finds that accounts under Section 5.6 are not "legal, valid, and binding obligations" if the account is time-barred. Thus, Plaintiff's inclusion of time-barred accounts in transactions under the Current Agreement and its simultaneous representation under Section 5.6 that they were "legal, valid, and binding obligations" did not satisfy Plaintiff's required representations and warranties under Section 5.6 of the Current Agreement.[59]

Additionally, the Court finds that Accounts under Section 9.2 are not "legal, valid, and binding obligations" if the account is time-barred. Thus, Plaintiff's inclusion of time-barred accounts in transactions under the Current Agreement and its simultaneous representation under Section 9.2 that they were "legal, valid, and binding obligations" did not satisfy Plaintiff's

---

[59] Section 5 contains Plaintiff's Representations and Warranties. It lists the representations and warranties that Plaintiff would make to Defendant "as of the date of the [Current Agreement] and the Closing Date."

requirements under Section 9.2.  Defendant, "at its election, may reassign any Account to [Plaintiff], and [Plaintiff] shall accept reassignment, if any condition in [Subparagraph 9.2 is] not met."[60]  Thus, while Defendant had discretion as to whether it chose to reassign Accounts not conforming to Section 9 to Plaintiff, Plaintiff was required to accept the reassignment.

## Breach and Anticipated Breach of Contract

The Court has held that Sections 5.6 and 9.2 do not contemplate time-barred accounts as "legal, valid, and binding obligations" under the Current Agreement.  Thus, by providing 960 time-barred accounts in its first group of accounts for sale under the Current Agreement, Plaintiff failed to satisfy its Representations and Warranties under Section 5.6.  Therefore, Section 4.3(B) was triggered, and Defendant had the option to terminate its obligation to buy Accounts on prospective Closing Dates.  Defendant exercised that option by notifying Plaintiff that it would not purchase time-barred accounts in the future.  Such action was not an anticipatory breach of the Current Agreement; rather, it was Defendant's right under the terms of the Current Agreement.  Thus, the Court finds that Defendant did not anticipatorily breach the Current Agreement.

---

[60]      Current Agreement § 9.  Section 9.2 contains an additional clause: "However, [Plaintiff] makes no representation or warranty of collectibility or otherwise, except to the extent the representation or warranty is stated in [the Current Agreement]."  A time-barred debt could be impossible for a creditor to collect if the debtor asserted the statute of limitations affirmative defense.  But the Court need not base its interpretation of Section 9.2 on Plaintiff's representations—or lack thereof—on debt collectibility.  Because the Court has interpreted the Current Agreement not to include time-barred debts as "legal, valid, and binding obligations" under the Current Agreement and Plaintiff represented and warranted to Defendant that all accounts would be "legal, valid, and binding obligations" under Sections 5.6 and 9.2, Plaintiff made binding representations about the Current Agreement's Accounts despite the final sentence of Section 9.2.

Nor did Defendant breach the Current Agreement by requesting reassignment of the Time-Barred Accounts and other noncomforming accounts. Under Section 9.2, Plaintiff was required to present Marketable Title, which included certifying that the Accounts would be legal, valid, and binding obligations as of the Closing Date for each transactions under the Current Agreement. Because the Court has held that Section 9.2 does not include time-barred accounts as "legal, valid, and binding obligations" under the Current Agreement, and Plaintiff included time-barred accounts in both the first and second group of accounts offered under the Current Agreement, Plaintiff breached its obligation to provide Marketable Title to Defendants under Section 9.2. This breach gave Defendant the option to reassign the nonconforming accounts to Plaintiff, and Plaintiff's refusal to accept the reassignment breached its mandatory duty under Section 9.

Therefore, the Court finds that Plaintiff breached Sections 5.6 and 9.2 of the Current Agreement by including 960 time-barred accounts in its October 2008 sale of 1,276 Accounts to Defendant and including an unspecified number of time-barred accounts in its second group of accounts. Plaintiff also breached Section 9 of the Current Agreement by failing to repurchase or accept reassignment of the non-conforming accounts identified by Defendant.

Thus, Defendant's Motion for Summary Judgment as to the parties' breach of contract claims is **GRANTED**.

## BREACH OF GOOD FAITH AND FAIR DEALING

In its Motion for Summary Judgment, Defendant moved for summary judgment on Plaintiff's claim for breach of the implied covenant of good faith and fair dealing.[61]  In its Complaint, Plaintiff alleged that Defendant "breached its implied covenant of good faith and fair dealing by contracting with [Plaintiff] to purchase Accounts, by causing [Plaintiff] to package and forward such Accounts, and then by refusing to pay for the Accounts" provided by Plaintiff.[62]  Plaintiff submits that Defendant "renegotiated the [Predecessor Agreement] with the goal to escape its contractual obligation to purchase [time-barred] accounts."[63]  Defendant responds to these accusations by stating that the parties' mutual agreement to omit eleven words from the Predecessor Agreement when they entered into the Current Agreement is not bad faith.[64]  Plaintiff replies that Defendant acted "under the guise of needing the change to conform to the requirements of its new investors" but that such requirements did not exist.[65]

Under Tennessee law, "the standard of good faith and fair dealing . . . is fairly flexible and depends upon the facts of each case."[66]  Tennessee common law imposes a duty of good faith in the performance and interpretation of contracts.[67]  Moreover, whether a party has

---

[61]     (Def.'s Mot. for Summ. J., D.E. # 81, at 4.)

[62]     (Compl. ¶ 65.)

[63]     (Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J., D.E. # 85, at 2.)

[64]     (Def.'s Reply Mem. of Law in Support of Def.'s Mot. for Summ. J., D.E. # 91, at 8.)

[65]     (*See* Pl.'s Sur-Reply to Def.'s Reply Brief, D.E. # 94, at 6.)

[66]     *Madden Phillips Constr., Inc. v. GGAT Dev. Corp.*, 315 S.W.3d 800, 823 (Tenn. Ct. App. 2009).

[67]     *Elliot v. Elliot*, 149 S.W.3d 77, 84-85 (Tenn. Ct. App. 2004).

complied with the implied duty of good faith and fair duty is usually a question of fact for the fact-finder.[68]

The Court finds that genuine issues of material fact remain as to the allegations of bad faith in this case. Thus, Defendant's Motion for Summary Judgment as to Plaintiff's claim of bad faith is **DENIED**.

## FRAUDULENT MISREPRESENTATION

In its Motion for Summary Judgment, Defendant moved for summary judgment on Plaintiff's claim for fraudulent representation.[69] Plaintiff included a number of allegations in its Complaint in support of its fraudulent misrepresentation claim.[70] Plaintiff asserts, and Defendant admits, that Defendant was aware that the underlying debt in unsecured consumer credit card accounts, lines of credit, installment loans, and other similar accounts "is often beyond the applicable statute of limitations."[71] The parties dispute whether Defendant knew that Plaintiff intended to include these time-barred debts in the Current Agreement.[72]

In Tennessee, a claim for fraudulent misrepresentation contains four elements: (1) an intentional misrepresentation with regard to a material fact; (2) knowledge of the representation's falsity—that the representation was made knowingly, without believe in its

---

[68]     *See Farris v. Standard Fire Ins. Co.*, 280 F. App'x 486, 487 (6th Cir. 2008); *State Indus., Inc. v. Twin City Fire Ins. Co.*, 158 F. App'x 694, 695-96 (6th Cir. 2005); *Madden Phillips Constr., Inc. v. GGAT Dev. Corp.*, 315 S.W.3d 800, 828-29 (Tenn. Ct. App. 2009).

[69]     (Def.'s Mot. for Summ. J., D.E. # 81, at 4.)

[70]     (Compl. ¶ 67-76.)

[71]     (Compl. ¶ 69; Answer ¶ 69.)

[72]     (Compl. ¶ 70; Answer ¶ 70.)

truth, or recklessly without regard to its truth or falsity; (3) that the plaintiff reasonably relied on the misrepresentation and suffered damage; and (4) that the misrepresentation relates to an existing or past fact.[73]  Claims for fraudulent misrepresentation may be submitted to the fact-finder when genuine issues of material fact are present.[74]

The Court finds that genuine issues of material fact remain as to the allegations of fraudulent misrepresentation in this case.  Thus, Defendant's Motion for Summary Judgment as to Plaintiff's claim of fraudulent misrepresentation is **DENIED**.

## **INDEMNIFICATION, DAMAGES, AND ATTORNEY'S FEES**

In its Motion for Summary Judgment, Defendant moved for summary judgment on Plaintiff's claim for indemnification.[75]  Plaintiff stated that, based on Section 12.2 of the Current Agreement, Defendant was required to indemnify and hold Plaintiff harmless for Defendant's alleged breach of the Current Agreement and that Defendant owed Plaintiff "reasonable fees and disbursements of counsel," including the "costs of this proceeding."[76]

However, because the Court has determined that Plaintiff breached the Current Agreement, the Court turns to Section 12.2's companion section, Section 12.1.  Section 12.1 provides the following:

---

[73]    *Cato v. Batts*, No. M2009-02204-COA-R3-CV, 2011 WL 579153, at *6 (Tenn. Ct. App. Feb. 17, 2011) (citing *Murvin v. Cofer*, 968 S.W.2d 304, 310 (Tenn. Ct. App. 1997)).

[74]    *See Assurance Co. of Am. v. Cont'l Dev. & Constr., Inc.*, 392 F. App'x 472, 474 (6th Cir. 2010); *Orchard Grp., Inc. v. Konica Med. Corp.*, 135 F.3d 421, 422 (6th Cir. 1998); *Elchlepp v. Hatfield*, 294 S.W.3d 146, 152-53 (Tenn. Ct. App. 2008); *Cortez v. Alutech, Inc.*, 941 S.W.2d 891, 892 (Tenn. Ct. App. 1996).

[75]    (Def.'s Mot. for Summ. J., D.E. # 81, at 4.)

[76]    (Compl. ¶ 59-62.)

<u>Indemnification by the Seller</u>.  The Seller will indemnify and hold the Buyer, its

affiliates, and any of their respective employees, officers, directors, and agents

harmless from and against any loss, claim, liability, damage, cost and expense

(including, without limitations, reasonable fees and disbursements of counsel)

that is based upon or due to any breach by the Seller of any representation or

agreement contained in the Agreement or in any document delivered in

connection therewith, or any negligent act, violation of applicable laws, or

misconduct by the Seller prior to the Closing Date.  At its option, the Seller will

have the right to assume the defense, in a manner and with counsel reasonably

acceptable to the Buyer, of any claims, actions, suits or other actual or threatened

proceedings and to directly pay for all losses, judgments, damages, costs or

expense (including reasonable fees and disbursements of counsel) which may be

imposed.  The Seller may not settle any claim, action, suit or proceeding for

which it has assumed the defense without the prior written consent of the Buyer,

which will not be unreasonably withheld.


Here, "[t]he language of the indemnification clause is clear and unambiguous.  Where the

language of a written instrument is unambiguous, the Court must interpret it as written rather

than according to the unexpressed intention of one of the parties."[77]

---

[77]    *Trinity Indus., Inc. v. McKinnon Bridge Co., Inc.*, 147 S.W.3d 225, 234 (Tenn. Ct. App. 2003).

The Court finds Section 12.1 unambiguous and clear on its face: it is an indemnification clause delineating the types of indemnification, attorney's fees, and damages due to Defendant in the event of Plaintiff's breach.  Tennessee follows the American Rule regarding attorney's fees, "which provides that litigants must pay their own attorney's fees unless there is a statute or contractual provision providing otherwise."[78]  Section 12.1 of the Current Agreement appears to the Court to be such a provision.  Accordingly, because Plaintiff breached the Current Agreement, it is liable to Defendant for attorney's fees in addition to indemnification and damages arising from the breach.

The Court notes that Defendant requested "an award of damages resulting from the breach in the amount of not less than $203,280.59."[79]  Defendant did not request a specific amount of attorney's fees or indemnification.  Therefore, Defendant shall submit within thirty (30) days of this Order a Motion for Damages, Attorney's Fees, and Indemnification under Section 12.1.  Plaintiff shall then have thirty (30) days following the filing of Plaintiff's Motion to respond.  The Court will then determine the amount of damages, attorney's fees, and indemnification to be awarded.

## CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**.  The Court will award damages, indemnification, and attorney's fees by separate order.

---

[78]    *Taylor v. Fezell*, 158 S.W.3d 352, 359 (Tenn. 2005).

[79]    (Def.'s Mot. for Summ. J., D.E. # 81, at 4.)

**IT IS SO ORDERED.**

s/ S. Thomas Anderson

S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date: October 18th, 2011.